UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

       -against-                                          92 Crim. 0230 (LAK)

ALLAN STONE,

                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Rhonda L. Jung
        Special Assistant United States Attorney
        MICHAEL J. GARCIA
        UNITED STATES ATTORNEY

        David M. Schwartz
        *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        Defendant was indicted in 1992 for conspiracy, six counts of securities fraud, eight counts of failure to file statements of ownership with the Securities and Exchange Commission ("SEC"), eleven counts of mail fraud, fourteen counts of wire fraud, seven counts of money laundering, three counts of false statements, and one count of obstruction of justice. By the time the indictment came down, he had left the United States for Costa Rica. He finally was arrested by Costa Rican authorities in 2006 pursuant to a provisional arrest warrant and now awaits extradition to the United States. He moves here to dismiss the indictment on the ground that he has been denied

2

his right to a timely prosecution and a speedy trial as allegedly guaranteed by the Fifth and Sixth Amendments.

*Facts*

Stone's motion suffers substantially from the fact that Stone himself has submitted no affidavit. His account is set forth principally in an affirmation and declaration of his attorneys, who quite plainly have no personal knowledge of the important facts, and unsworn e-mails and other documents that allegedly emanated from Stone. Nonetheless, the basic outline is clear enough.

Stone concededly left the United States for Costa Rica in April 1991,[1] a fact the government says it discovered in early 1992, prior to the return of the indictment.[2] The indictment was returned and an arrest warrant issued on March 24, 1992.[3] On April 13, 1992, the United States Attorney's Office ("USAO") submitted a request for a provisional arrest warrant to the State Department.[4] The Special Assistant United States Attorney states that she was informed that the

---

[1] Schwartz Aff. ¶ 6.

[2] Jung Decl. ¶ 5. The record contains several declarations by Ms. Jung. Unless otherwise indicated, references to the Jung Decl. are to that attached to the government's memorandum of law in opposition to defendant's motion to dismiss, filed April 20, 2007.

[3] Gov't Mem. Ex. 1.

[4] Jung Decl. ¶ 7; Gov't Mem. Ex. 5.

One of Stone's lawyers claims that the U.S. government never requested Stone's provisional arrest based on the 1992 arrest warrant. Dranove Reply Decl. ¶ 17. But he has no personal knowledge of that fact. He seems to imply that it is so because what he says is the Costa Rican extradition file was opened in 2006. *Id.* ¶ 16. But this implicit contention cannot be credited.

3

Costa Rican government granted the request for a provisional arrest warrant on May 26, 1992, but no documentary evidence has been furnished.[5] In any case, however, it is undisputed that Stone was not arrested by Costa Rican authorities until 2006.

In an effort to cast blame on the government for the lack of an arrest between 1992 and 2006, Stone's counsel claim that he was living openly under his true name in Costa Rica. They seek to create the impression that the government had only to ask in order to have had him arrested. But the proof falls woefully short of establishing any such thing.

They begin with the assertion that Stone in 1991 obtained a Costa Rican driver's license in his own name.[6] The attorney who so claims, however, does not claim personal knowledge of that alleged fact. He simply attaches copies of what purport to be two Costa Rican driver's licenses in the name of Allan M. Stone, both purportedly issued on July 5, 1991 and expiring on March 8, 2006 and January 8, 2011, respectively. But the authenticity of these documents has not been established. No explanation has been offered for the existence of two of them, each with a different expiration date. In any case, neither document contains the licensee's address. Thus, even if the licenses are authentic, their existence does not establish that Stone's whereabouts were known even to the Costa Rican motor vehicle authorities, much less to the U.S. government.

---

To begin with, most of the four volume file is in Spanish, and Stone has not favored the Court with translations of its contents. It therefore is impossible to be certain that the file was opened in 2006. Even assuming that is the case, however, the fact (if it be so) that Costa Rica opened an extradition file in 2006 in response to the 2006 request for extradition does not establish the absence of such a request in 1992. Indeed, for all we know, there may be a 1992 extradition file that was opened upon receipt of a 1992 request for a provisional arrest warrant.

[5] Jung Decl. ¶ 7.

[6] Schwartz Aff. ¶ 7.

4

The next claim made by the attorney is that Stone was recruited by an acquaintance, Paul Lyles, to work under an FBI agent named Frank Banks to seek out U.S. fugitives in Costa Rica. He speculates that this required an FBI background check and states that "Banks [thereafter] informed *defendant* that [the check] revealed no prior charges or outstanding or pending arrest warrants."[7] The problems with these assertions are several, including:

- The attorney has no personal knowledge of the facts.
- A nationwide search of FBI employment records found no record of any FBI employee named Frank Banks.
- A global search of FBI records found no record of any confidential source or informant named Allan Stone.[8]

In an effort to deal with this, Stone's counsel have submitted in reply an affidavit of Paul Lyles. Lyles claims that he recruited Stone in 1994 to assist in tracking down fugitives wanted by the FBI and that the two of them worked under the supervision of an FBI agent named Ken Kemp, not Frank Banks.[9] According to Lyles, Lyles told Agent Kemp that he wanted "Allan Stone" to work with him, gave him defendant's full name and other pedigree information, and was told some time later that there were no warrants on Allan Stone.[10] Despite its improbability and its clear inconsistency with the affirmation previously submitted by Stone's attorney, the Court for present

---

[7] *Id.* ¶ 9 (emphasis added).

[8] Jung Decl. ¶ 10.

[9] Lyles Decl. ¶¶ 4-5.

[10] *Id.* ¶¶ 19-20.

purposes assumes the truth of Lyles' assertions.

Next, Stone's attorneys claim that Stone repeatedly was in touch with the U.S. Embassy in Costa Rica beginning in 1998[11] and that the Embassy knew his address.[12] Again, however, counsel has no personal knowledge of the facts. The only documentation that has been submitted to back up these contentions consists of a letter from a vice consul addressed to Stone in care of one Bernardo Porras Paniagua[13] and a purported letter from Stone to the vice consul that does not contain an address and that is signed "M. Allan Stone," not "Allan Stone."[14]

Finally, Stone points to alleged contacts between his wife and the U.S. Embassy, himself and an SEC attorney, and a lawyer acting on his behalf and the USAO.[15] In many instances, the allegations are supported only by lawyers' statements concerning matters of which they have no personal knowledge. In no case is there any claim that Stone or anyone acting on his behalf informed any official of the U.S. government of his whereabouts.

The government asserts – albeit only in its unsworn memorandum – that it had no "specific, actionable intelligence on Stone's whereabouts" between the date of the indictment and June 22, 2006, when Costa Rican authorities notified the State Department that Stone had applied

---

[11] He then applied for renewal of his passport. Renewal was blocked. Schwartz Decl. ¶ 10.

[12] Schwartz Decl. ¶¶ 11-13.

[13] *Id.* Ex. C.

[14] *Id.* Ex. D.

[15] *Id.* ¶¶ 14-15; Israel Aff. ¶¶ 9-22.

for political asylum.[16]  Fearing that the earlier arrest warrant had expired, it obtained the issuance of a new arrest warrant from this Court and requested Stone's arrest in and extradition from Costa Rica.  This time, Stone was arrested and now is in Costa Rican custody awaiting extradition.

*Discussion*

"Whether excessive delay violates the Speedy Trial Clause [of the Sixth Amendment] depends on a balancing of four factors: (1) the length and (2) reason for the delay, (3) whether the defendant timely asserted his rights, and (4) whether the defendant has been prejudiced by the delay."[17]  "A long delay between indictment and trial is presumptively prejudicial to the defendant and triggers an inquiry into the other three *Barker* factors."[18]  But "presumptive prejudice does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger" the four-factor inquiry articulated in *Barker*.[19]

While the fourteen year interval between indictment and the 2006 extradition request was long, it is not entirely clear that it should be characterized as "delay" for purposes of speedy trial analysis.  "Delay," whether as a noun or a transitive verb, implies the existence of one responsible for postponing, impeding, or putting off something.  In consequence, it is at least arguable that an interval between indictment and trial, in order to be regarded as "delay," must be attributable to fault

---

[16] Gov't. Mem. 12-13.

[17] *United States v. Jones,* 91 F.3d 5, 7-8 (2d Cir. 1996) (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)).

[18] *United States v. Blanco,* 861 F.2d 773, 777 (2d Cir. 1988).

[19] *Doggett v. United States,* 505 U.S. 647, 652 n.1 (1992).

7

on the part of the government and becomes "excessive" only when the period attributable to the government's failure to exercise due diligence to bring the defendant to trial becomes too long. The Court assumes, however, albeit without deciding, that the time interval in this case alone is sufficient to trigger the *Barker* analysis.

The reasons for the delay in this case are not entirely clear. What we know is that Stone left the country before the first arrest warrant was issued. The government promptly requested a provisional arrest warrant from Costa Rica. Stone was not arrested until fourteen years later after the government requested another such warrant from Costa Rican authories.

In the interim, Stone would have the Court believe, his whereabouts either were well known to at least some people employed by the United States or, at any rate, easily ascertainable because he was living openly in Costa Rica. But there is literally no competent evidence in the record to suggest that this is true. Moreover, there are substantial indications to the contrary. When, for example, Stone's wife went to the U.S. Embassy in Costa Rica in 2002 to request an emergency passport for Stone, the Embassy employee who met with her noted that Stone's wife refused to allow Embassy personnel to see or contact Stone and wrote that "they've been hiding out in Costa Rica for approximately 12 years." She noted also that "Stone . . . refuses to appear personally at the Embassy."[20] Likewise, in a purported June 29, 2002 e-mail from Stone to one of his attorneys, he wrote that he was "so used to Oscar . . . [that] it seems strange to respond to AS [Allan Stone]!!" He went on to say that "[f]or years we lived in the mountains . . . . Moved often and avoided

---

[20] Gov't. Ex. 8.

town."[21] While none of this necessarily is conclusive, the fact remains that it is Stone's burden to show that the government is responsible for all or a sufficient part of the interval between 1992 and 2006 to warrant the conclusion, in conjunction with the other *Barker* factors, that his speedy trial right was violated.[22] But the evidence is such that the Court can find only that the government sought his arrest by Costa Rican authorities in 1992 and that he was not arrested until 2006.

While the government has "an obligation to exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution,"[23] "a state is perfectly entitled to rely in good faith upon the efforts of another jurisdiction when a suspect for whom an arrest warrant has been issued evades arrest in the first state and absconds to that other jurisdiction."[24] The government initially discharged that obligation in 1992 by requesting Costa Rica to arrest Stone. And it is impossible to say on this record that the government thereafter failed to exercise due diligence when Costa Rica failed to take Stone into custody. While the government,

---

[21] Israel Decl. Ex. 2.

[22] Stone has the burden at least to submit evidence that, if credited, would establish that the *Barker* factors weigh in his favor. *See United States v. Lane*, 561 F.2d 1075, 1078-79 (2d Cir. 1977); *Holmes v. Bartlett*, 810 F. Supp. 550, 562 (S.D.N.Y. 1993); *United States v. Forrester*, 837 F. Supp. 43, 46 (D. Conn. 1993). A defendant in a criminal case, in order to warrant an evidentiary hearing on a preliminary motion, is obliged to carry the burden of going forward by submitting competent evidence to substantiate the facts relied upon. Such evidence typically is introduced through a sworn affidavit submitted by the defendant or by a person with personal knowledge of the facts raised in the motion. *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967); *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998).

[23] *Rayborn v. Scully,* 858 F.2d 84, 90 (2d Cir. 1988).

[24] *Id.* at 91.

9

in 1998 when he applied for renewal of his passport,[25] obtained information that Stone was in Costa Rica, it was under no obligation to attempt to mount a manhunt in a sovereign nation in an effort to assist Costa Rican authorities in executing their provisional arrest warrant, at least in the absence of evidence that Costa Rica was not making a proper effort to arrest Stone.[26]  In consequence, the Court cannot fault the government here.

Nor has Stone established any actual prejudice.  He claims that he was prejudiced by the death of a former SEC investigator, Howard Carolan, and the alleged destruction of certain allegedly relevant materials in the September 11, 2001 terrorist attack.  But there has been no competent showing to substantiate either the materiality of the late Mr. Carolan or the existence, destruction, or materiality of the allegedly destroyed SEC files.

Finally, defendant did not until this motion make any effort to assert his speedy trial rights.  Even if the unsubstantiated claim of ignorance of the indictment between 1992 and 2002 were credited – and there is no basis for doing so in the absence of sworn evidence from the defendant – defendant concededly has known of the indictment since 2002 and done nothing either to proceed to trial or to assert the claim now asserted.

In sum, then, the *Barker* factors all point toward denial of this motion.  There is no basis on this record for attributing any of the passage of time from 1992 until 2006 to the government while defendant is responsible for at least the period 2002 to 2006 and, more likely, the entire interval.  There has been no competent showing of likely prejudice.  There has been no timely

---

[25] Schwartz Decl. ¶ 10.

[26] *Rayborn,* 858 F.2d at 91.

effort by defendant to assert his speedy trial rights.

*Conclusion*

For the foregoing reasons, the motion to dismiss the indictment is denied.

SO ORDERED.

Dated: September 24, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)